First case up this morning is 4-12-0950 Henry, Marriage of Wheat. For the appellant is Gregory Scott, for the affiliate Stephen Willoughby. Can I ask Gregory, sir? Yes, sir. Mr. Scott, good to see you, sir. Can I please support? Council. Council. Your Honor, we brought this appeal based upon two claims of the court's ruling being against the manifest way of the evidence. In this case, it's a little bit different than in all cases with regard to cohabitation, in that they had an agreement that acknowledged that cohabitation could occur even though there are separate residences. And in this case, we believe the totality of the evidence that was hits all the bases on the factors that all the cases cite as to what a court is supposed to look for. We believe that, and there was a specific provision in Section 6.03 of their agreement, and Section 6.03 of their agreement provided that if she was cohabiting and living in a separate residence and notified him that she could get three more years of maintenance, and they negotiated that because he wanted her and she did acknowledge in the agreement that cohabitation may occur in separate residences. And in essence, her argument and her position in this case is we're only in a dating relationship because he has his separate house and I have my separate house. We keep separate bank accounts. We don't intermix our accounts at night. But what we want you to look at and what we ask the court to look at is look at each of these factors. Snow sets out the five factors. I think they're repeated in Susan. They're repeated almost in every maintenance case. But the length of this relationship, it started about the month after the divorce was signed. They began a relationship which by time of trial was a continuous, exclusive sexual relationship for that period of time. All the cases that have been before the appellate course usually see cases where they find that there's cohabitation in the two to three year type of relationship. The court seemed to diminish the length of time of this relationship, which we think is against the evidence. Did both parties testify before Judge Coryell? Yes, Your Honor. Both parties and Mr. Flombelle testified as well. Okay. That was a day's worth of testimony? Yes, Your Honor. You were the petitioner? Yes, Your Honor. Okay. Well, what's troubling is... I'm actually responding in the case, but petitioner for the... Petitioner on the motion. Yes, Your Honor. On page 32 of your brief, you say the statements of the court show the court totally ignored the considerable evidence before it in a much deeper relationship. What if the court had said, Mr. Scott, after hearing all the evidence, I've heard all the evidence, motion denied, walked off the bench? I think that's his option, and I think they were the... Those are the kind of... It used to be there was a nice judge in Santa Ana County that would always... They said, don't give the SOBs and the appellate court anything to reverse your message. Don't give them anything to look at, you know. Well, wouldn't we be confirming his worst fears if we parsed the statements of the trial court? And by the way, you know, I was a trial judge for 12 years myself, and this book was a long time. Justice Turner was a trial lawyer for a long time. We've had a lot of experience in courtrooms, and we understand litigants, and I've seen it happen. When you put on a day's worth of evidence and a bunch of arguments, and the judge says, denied, walks off the bench, people feel somewhat short-changed by that approach, as I'm sure you would too. The flip side of that is I'm very hesitant to start hanging judges because they... The one presented with this day's worth of testimony, he didn't mention the stuff that was testified to at 214 to 228 in the afternoon, etc. No, I fully agree with you, Justice. I think that when we look back, as you're doing, and you're reviewing, you look back at his statements, which gives you an insight as to what some of his thoughts are, but then what we're asking you to do is look at the whole picture of what was presented. Because what was presented... Why should we assume that he ignored what was presented, and he didn't consider what was presented? Why shouldn't we assume he considered all of it in his making? He's just pointing out some things in particular that struck him. Because if you had considered everything that was presented... You would have won. Yes. Yeah, we hear that argument a lot, Justice Kennedy. We do, Judge, and that's why we're here. But what I'm saying is, you give trial practitioners like myself, and trial judges, guidelines by your rules. And we have five factors that have been repeated over and over and over and over. And what we presented was evidence on each of those five positions. And the evidence against those five positions is very small. The evidence that was... And again, the Court mentioned, he says they take trips that they don't include themselves in. But when you cross-examine, Mr. Flombelle said he takes some guy trips. He took a couple of guy trips, maybe a golf trip and a hunting trip. And her non-Mr. Flombelle actions are she goes out to eat with her co-workers on occasion. But they took trips with her mother, and they stayed in the same room, and they stayed in the same suite, and they traveled together to his friend's house in Wisconsin on a ski trip. They go to concerts together. They go to a comedian's show together. They do everything like a couple. One thing I think what the judge stated is a misstatement of the evidence, in that they didn't hold themselves out as a couple. Both Mr. Flombelle and Bobby both testified. They hold themselves out as a couple. What does that mean? Well, it means, you know, it's people... It means they present themselves in the same type of relationship as you or I would with a spouse. I'm not a Facebooker. I'm married to one. And if you look at this person's Facebook, Mr. Flombelle, for years, not just months, but for years, his Facebook includes him and Bobby. And that's a presentation that this is a strong, deep relationship. And I guess it's where do you slice the line. If you have a person that knows the rules, for lack of a better term, and says, well, we only stay together three nights, then we're okay. Whereas if we stay together four nights, then we're not okay. Or if I buy this time and you buy that time, then we're okay. But I mean, there's so much interaction here. I mean, just when he needed money. And I think that's important. He needed money in December of 11. He went to her and she loaned him the money. That shows the type of... But he paid her back. Well, is that typical in a marriage? A lot of my clients don't get paid back, I must admit. But a lot of my clients don't loan money either. And I think what that shows is the husband and wife type of interaction. Just like going to the grocery store. Just like, hey, pick me up some beer. If I didn't know here, this is a matter where trial judge heard all this, saw all this. And this reminds me of kind of a situation where we see those a lot, as I'm sure you're familiar with. Who's going to be the better custodial parent? And when evidence has been presented in support of the mother and in support of the father, my sense, and I try to explain this when I teach at law school, is if there's evidence supporting both, whichever decision the trial judge makes is going to be right in that we're not going to set it aside. It's a discretionary call based upon the evidence presented. And on this continuum from who's going to win this question, there's about 80 percent of that, that based on the evidence presented, it's going to be affirmed by us because it's not reasonable only at that 10 percent extreme in each case where the evidence is so overwhelming for the one or so overwhelming for the other. It seems to me, for all the reasons you've talked about, this is one of those continuum matters where had Judge Coryell said, no, I'm sorry, this is no dating relationship, we are in a situation where the maintenance payments should be terminated because of this relationship they now have, and had Mr. Willoughby been the appellant, I'd say, hey, Judge heard it all. There was evidence to support the judge's finding that in support of Mr. Scott, and unless it's unreasonable, we're not going to be going that way. It doesn't apply here unless it's an unreasonable decision by Judge Coryell based on the evidence that's before you. You're not remaking a decision, but as you balance the evidence that is there, there's very little to support it's just a dating relationship. There's very little evidence that doesn't show that this is a de facto husband and wife relationship. If you look at the Susan case, this is almost exactly the same as the Susan case. In the Susan case, they kept separate residences, they didn't have any joint bank accounts, they didn't have any of the financial interaction that Gobby and Mr. Flombelle have. They didn't have loans to each other, paid back or not. They didn't have the fact that they are advancing money on trips, paying for the trips, paying for one trip, the other person pays for a meal, then the other person, they buy things for each other, they go out, they go gift shopping together. And I think another thing that is very important in this case is the way that the reaction of her to his family is very important and is a factor that I think you should consider. In the Susan case, didn't the trial court find in favor of terminating maintenance? Yes, Your Honor. And the appellate court said, works for us. And that's why I think this one should work for me. Well, that's the difference. The trial court here didn't find that. In my view, the appellate court is not to supplant its thinking versus the trial court, but it is to analyze and to determine if the weight of the evidence is such that the judge should have made a different decision. Well, how would you distinguish this from a dating relationship? You claim it's something different. Here's why it's not a dating relationship. First of all, very few people that are dating go on trips with someone else's family member, let alone their mother. Secondly... Now we're talking about folks who aren't teenagers or in their twenties. They've got kids and relations and stuff. I also believe the way that the families interacted that I was starting to talk about, they started out where the kids hated her or didn't hate her, but they disliked her because it was him starting the date right after the divorce. And she went to the intervention for his son at the hospital, which shows a much deeper commitment when you go to one of those events than if you just go to visit somebody that's sick. This is an intervention where they are trying to change that person's lifestyle and their own lifestyle and reaction to him. But you might do that with a good friend too, wouldn't you? You wouldn't necessarily have to be a married couple. But the people that were invited to this event or intervention were family members and strong friends of the child. So she's included as a family member. She's included on all the holiday celebrations. She's invited to his mother's home, father's home. The mother gives her the tacky sweater for the tacky sweater party twice a year. And these people have assimilated her as a family member. I think being a family member connotes something more than just a dating relationship. She gives gifts to the kids when they go back to college. They shop for gifts together for the children. They give gifts back and forth. The children show love and affection to her. She does towards the children, towards his parents. Her mom comes from Hungary. They all learn enough Hungarian to call her Moody. You know, his kids know her mom. It is one family type unit. And that's different than just a dating relationship in my opinion. There's no objective test, but when you have the deep commitment type of test, then I think that that crosses the line. In addition, he provided free legal services for her starting from, you know, July of 10 on. He even filed actions in this proceeding for her for free. And all of those actions he didn't charge her for. They go to each other's homes. They work in each other's homes. They prepare things in each other's homes. In and of itself, each one of these may not be different than a dating relationship. But if you look at the package, and that's why I think, you know, the Sappington Court and a lot of these courts talk about the totality of the evidence. And that's what you look at. What is a husband-wife relationship? You know, I mentioned going to the store or going out to eat. It's customary for husbands and wives to say, honey, do you got any money in your wallet? Or, you know, who's got money left on the MasterCard? Or, you know, hey, I'm out of beer. I'm out of cigarettes. You know, what are you picking up for dinner? And that's what was going on in this relationship. And that's what we showed. And it was showed as a long-term pattern. Not just six months or five months or ten months. This has been consistent. They tell each other they love each other, which is not unusual in dating. I'm not going to say that. But every morning, every night, they call each other. I mean, they're comfortable enough that he stays over at her house. He doesn't have a toothbrush. He doesn't have deodorant. And he uses hers. That's a pretty close, comfortable relationship. Some husbands and wives don't allow that. But I'm just saying that, you know, that this totality of how they interact. And they're known in the community as a couple. And they're known in the internet as a couple. I believe that when you look at the totality of everything, it's much more than dating. And that's what we're asking this court to do. Mr. Scott, I'm curious. The language in Section 6.03 of the agreement, of course, you're familiar with it. You've cited it. Do you think that the fact they incorporated that language into their agreement makes this case distinguishable from the other cases that you've cited? I think it makes it much stronger and distinguishable if you were going to enforce the agreement itself, yes. Because it is an acknowledgment by a party that cohabitation exists even if you have separate residences. Usually in the Brent case, I think I cited to the court, is in a marital separation agreement, if you put more terms in to terminate maintenance, that is a basis that can be considered and it will show that those terms mean something. I know that Mr. Willoughby argues that that's just, it doesn't mean anything. It's the same standard. I don't think so. I think what it is is both parties acknowledging cohabitation can exist in separate residences. But why doesn't that language mean even if you each have your own residence, if you're cohabiting in fact in one of the two residences, we're going to terminate maintenance. Isn't that what that paragraph means? I think it means that you can keep your separate residences as a form of ownership and a place to go and you still can be cohabiting based upon what you totally, how you totally interact. It doesn't mean you have to be residing in one residence. But that's really the law anyway, isn't it? So isn't that the law anyway? It is, but it also is a specific acknowledgement by her in this agreement that says, yes, we acknowledge that this can occur and if it does occur, we've negotiated some terms associated with that. And in this case, we believe that cohabitation has been shown even though they have separate residences. And one of the problems that always occurs in these cases, and I know I'm going to say this, people will go home at night like the Heron case and they will maybe live without heat and then come back on weekends and not spend the night or that type of thing in an effort to avoid the termination of maintenance. And I think it's important for you and your position to help people in my position, Mr. Willoughby's position, and people on the bench to know where is that line divided, not just, you know, well the judge said that so he must have considered it or must not have considered it. I think we need to say if you hit these five factors, what is going to happen? You know, if you prove all five facts like I believe we did here and the judge says sorry, does that just mean that, you know, the next case if the judge says okay, same evidence, does that mean there's no standard? I think what we need, trial people need, is standards that can be enforced. And I believe this is a case that will give you the opportunity to do that. I think this is a case where if you do look at the totality of the evidence, you'll agree with me. Thank you, Mr. Scott. Your time is up. You have a chance to address us again, excuse me, again in rebuttal. Mr. Willoughby? May it please the court? Counsel. Counsel. I think the court got it right and I think this court has pointed out in the questions to Mr. Scott that this is a, whether you're going to second guess the trial judge and I think it's interesting and I put it in the record in my argument, he clearly understood them all. All the cases that we argued in this brief were presented to him. He asked the question to me in the record, are I supposed to look at this totality of the circumstances? I said we both responded yes. And I'm not supposed to single out anything, one thing or another, so the whole marriage. And the answer was yes. Mr. Scott and I agree, that's the law. What we don't agree on is that Judge Correll didn't get it right. I look at the prior fact. If it had been a juror, they would have got the jury instructions, the courts well know, that they don't have to abandon their observations of life. I call it the common sense instruction. So that's why the deference I would submit that the appellate courts have said should be given to trial court because he's looking at things using his own experiences in life, he's listened to all the evidence, and he just didn't buy Mr. Scott's slant that your date is not supposed to be nice to your family. I hope she is. If your son has a problem and she has a psychology degree, a master's in psychology, that's not what a date does, Mr. Scott says. I hope she does. And he uses the word one time in his brief which sent the message to me, he says this isn't casual dating. I think this is what is not casual dating. I guess not. Well, then are we now asking this court to try to cut fine lines away from the trial judge's observations of life, what he saw, and says well casual dating moves to more serious dating which moves to something else that eventually crosses the line. N. Ray Saffington, contrary to what Mr. Scott said, said every case is going to be decided with its own facts. You have to look at totality of circumstances. You're not going to find a situation rarely that you can just apply a mathematical figure to and say maintenance terminates in this case. Another thing that Judge Correale was paying very particular attention to evidence, he said these people spent about 6 to 15 hours a week with each other. Now Mr. Scott argues he got that wrong, but it was never any pointing out in the record of where he got it wrong. There was never a motion to reconsider and say judge your calculator was wrong. 6 to 15 hours a week, both these people went through bitter divorces, that was the evidence, and both of them weren't interested in jumping right into another marriage. They preferred their own space. She has a time-intensive job, he has a time-intensive job, they work a lot of hours, they work separate. The distinct Judge Correale saw differences in the cases that we all cited. Harrim, this court here said this is a sham. He says he goes home to a place that doesn't have water, heat, or electricity, and this would be exalting form over substance. This is really not his residence and the other factors in Harrim. In the other case he says Susan, the court twice said, the trial court said, the public court said twice, she never offered any evidence, they don't spend nearly all the time together every day, and that was one of the factors that the trial court used. This is a 6 to 15 hour week visit. Maybe swing home, go by there, hey how you doing for an hour or two, and then go home. They have, as a monogamous dating relationship, where a mother came from hungry, they spent some time with her mother. That's what people dating do, and that's what the judge said. He said this is not even close to de facto marriage. This is a dating relationship. They enjoy their own separate space, they want their separate space, they help out other people as friends would do, close friends. As Justice Polk pointed out, would a friend maybe show up if your kid was in trouble? Yes. And if you happen to be dating and she has some insight in counseling and stuff like that, it's nice that she would show up. Contrary, the evidence was not that she attended every family function. There were specific times when she had attended family functions, but she didn't attend them all. They spent holidays together, correct? They spent some holidays together. That's one of the Scott factors. Sure. She hosted a birthday party for him once, I think when he turned 50. And they vacationed together, and that's another one of the factors. Sometimes they vacationed together, and those were very specific of when they were. She testified to them of when they were. They went on separate vacations also. The relationship's length is one of the factors. Yes, it is, Judge. What's your argument on that? Was it just like three years? The argument there is that the case law instruct us we're not to single out any one fact. Well, there's three that seem to weigh against you out of the six. The second one is the amount of time the two spend together, and you say that weighs in your favor because it was only 6 to 15 hours a week. How about the nature of the activities they did together? Well, Judge Correale again looked at those and says that's no different what people date. They go out, that's treat, which I kind of jokingly said in my brief, that that's not my experience with a married couple. I mean, you know, it's your turn to pay, my turn to pay, honey, that kind of thing. That's not what married people do, I would submit. They always, if they did travel together, they always... That's what dating people do, then? Usually when I went out, I paid. You know, if I hoped that the date to end well, Your Honor, I paid. Now, if she offered to pay, I would have been surprised. You talk about the totality of the circumstances. Is it the totality of the circumstances in light of the six factors? Well, I pointed out in my brief, there's been other ones considered. You know, I didn't recite the case law, I stole it out of a treatise, to tell you the truth. But like where they do have power of attorneys for each other's health care and financial affairs, you know, they put each other under wheels. There's a lot of other factors that have been found in other cases. But the bottom line is, you got a judge who looked at it, he applied, heard all the evidence, he knew the law. And he said, you know, this isn't close to a marriage, in my mind. Now, do we look at this and say, this is just something that no reasonable person would ever say? Well, when he says it's not close to a marriage, it depends on what marriage he does, doesn't it? Well, I've seen some pretty bad ones that were probably not as good as this dating relationship that Mr. Scott has too, I'm sure. You know, they don't go anywhere together, they can't even be in the same room with each other. But that doesn't mean the trial court, I would submit, got it wrong, which is, I think, the standard review. And he didn't think it was close. And he saw distinctions. He saw the Herron case was different, he saw the Susan case was different, all the other cases cited here, he saw there was something substantially different. And he saw the people, he saw their demeanor while testifying, all the evidence came from my client, Gabriel Weed, we call him Gabby, and Mr. Fombell and his children, which were right there. Then he says gifts, I mean, no offense to Mr. Fombell, but he's cheap. I mean, some of these gifts were like $25. You know, that would be maybe a gift for Christmas, you know. There wasn't exorbitant, expensive gifts. That sounds like a marriage, doesn't it? I don't know how lucky you are there, y'all. I get that from your argument, had your client lost, you would be up here on appeal and basically would have no chance, because what are they going to have to do with the trial court? If I lost, I would have to warn my client, this is bad money being thrown away, because my odds of a judge who's heard the case didn't make a mistake in the law. You know, he didn't say something that, you know, clearly would, whoops, you know, it was his take of the facts and the standard review, I would try to discourage a review. One other thing here is, you asked Judge Turner about what 603 did, and 603 was just acknowledged what the law was anyway. Yeah, that's why I understand why it was inserted. Well, I said it was an afterthought. You know, it was brought up at the very end of almost an argument in the trial. And, of course, I made the same argument, and I said, you know, obviously, just because, as inherent, you maintain a separate residence, but you're really a de facto couple, married couple, it doesn't matter you've got a separate residence. You've got a lot of extreme, you've got rich people that may have five or six residences, but they're together, you know, every day in one of them or another one. Just a matter of fact, to keep separate residences is not a controlling factor, and so I don't see the significance of that. It does, there was another clause in there that never came up. If she had decided and interpreted somehow that she could be cohabiting, she could have gave notice of maintenance for three more years. That was never, never, there was never even any evidence of when Mr. Scott thought this moved from a dating relationship to a de facto marriage. So, I mean, I was just throwing stuff on the wall, every little thing. Facebook's like, you know, love you, honey, you know, that type of thing, which dating couples sometimes say on the second date, maybe the first date, you know. Depends how loose they are with that word. So, I think Judge Correale applied his correct knowledge of the law, he said it was right, the law was not misstated by him. He said, he applied his take on the experience of life, about how people date, and he said this is not even close to a de facto marriage. And true, he did not go back through six, seven hours of testimony and put every point in where he considered, he said some of the main points, which was the six to 15 hours a week comment. But I think he could have just said, motion denied, petition denied, and walked off. There was never a motion to reconsider, saying, you know, didn't you please state the factors, you know, can you issue a written opinion or anything like that. There was never anything like that done where he could have made something wrong. So, I think it's a slippery slope. If we open this Pandora's box and start saying, well, we're going to second guess the trial judge, who said the law, he understood, and he applied all the facts, and he says, you lose. And I think it's a slippery slope if we do what Mr. Scott is inviting this court to do and say, draw a bright line. And race happiness says there is no bright line. It's a totality of circumstances, and every case will turn on different facts. I don't need my entire time. Someone's got a question? Okay. Thank you. Seeing none, thank you, counsel. Mr. Scott? Thank you, Your Honor. I would like to address the six to 15 hours a week. The which, sir? Six to 15 hours a week. Sure, go ahead. The both parties testified they see each other four to five days a week. They stay overnight two to three times a month. They, on weekends, not midweek, the four to five days is midweek. On weekends, they go out to his parents' house. They run the dogs two times a month. They go out to eat, as shown on her Exhibit 17, on weekends frequently. They go on trips on weekends. They go on weddings. They go to events at her tacky sweater party through her work. They go to work events. So it's much more than that. Justice Turner, you talked about holidays. They spend Christmas, Thanksgiving, Fourth of July, Easter, and Valentine's Day together with families, with extended families, at the family events. They have birthday parties together. They always stay overnight on each other's birthdays. There's evidence of where she took his family not only his 50th birthday, but the 49th birthday, which was at the Fuji restaurant. And one thing I thought was kind of interesting, as soon as we filed, they stopped going to the Fuji restaurant, because I guess they thought they were seeing What restaurant? It's Fuji, F-U-J-I. What's the significance of that? I guess because they thought they were seeing there. I don't know. It's just, you know, I thought that was just, that's just one of the Is that indicated? I think so. I apologize. I don't know. It's supposed to be. It is indicated. Okay. And Dutch Treat, I mean, I don't know. When I dated Dutch Treat, if you went Dutch Treat, I paid my half, she paid her half. You don't do this sharing like couples do. You got money, yeah, I don't have money, okay. You know, that is what I think is different. And the gifts, even though they were cheap, were specific and showed a level different than just, I'm buying you a necklace or I'm buying you a shirt, a golf shirt. He bought her a gift certificate for Shields so she could go out there and get boots for her dogs because they run at the parents' home. And that was a very specific gift. She bought him a special seat back for his car because he has a bad back. When his son was problematic, she bought him a safe and a special lock for his bedroom. So these may be cheap, may not make it to the super level of dating, but they are more couples gifts of like, I know what you need. I know what you want. And these are specific, although cheap, gifts that show the level of the relationship. And I do ask... What do you think the trial court was focusing on when it came to the conclusion that stated that the case is not even closed? I think they're wrong. And what they were focusing on, I think this court, the trial court assumed... I'm just curious what would have made the trial court think it was closed. I think because the court focused on their testimony that said they get together four to five nights a week. He doesn't stay all night. Sometimes it's two hours. Sometimes it's till late at night. And I think it got focused on six to 15 hours based upon what he said. And I think that that doesn't... If he steps back and looks at it a little closer, maybe he sees all these other things. So that would be my guess. Thank you. Thank you, counsel. Court of Bailiffs is now under advisement of being recessed.